UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.:  18-31552 (AMN) |
| MICHAEL P. DILWORTH, | : | Chapter 7 |
| *Debtor* | : | |
| | : | |
| | : | |
| THE MCFEELY LIMITED | : | |
| PARTNERSHIP, | : | |
| *Plaintiff* | : | Adv. Pro. No. 18-03034 (AMN) |
| v. | : | |
| MICHAEL P. DILWORTH, | : | |
| *Defendant* | : | |
| | : | Re:  AP-ECF No. 95 |

## <u>MEMORANDUM OF DECISION AND ORDER AFTER TRIAL</u>

*Appearances*

Thomas J. Sansone, Esq.                    *Counsel for Plaintiff*
Carmody Torrance Sandak & Hennessey LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509-1950

Timothy D. Miltenberger, Esq.              *Counsel for Defendant*
Cohn Birnbaum & Shea, P.C.
100 Pearl Street
Hartford, CT 06103

## I.  <u>INTRODUCTION</u>

The plaintiff and creditor here – the McFeely Limited Partnership (the "Partnership"

or "plaintiff") – asks the court to declare non-dischargeable a claim of more than

$6,000,000 described in a 2015 promissory note from Michael P. Dilworth (the "Debtor")

to the Partnership pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(6).[1]  The underlying

---

[1]        Title 11, United States Code, is the "Bankruptcy Code."  References to statutory sections are to the
Bankruptcy Code unless otherwise specified.

obligation represented by the note arose over a period of years, from 2003 through 2011. AP-ECF No. 1.[2]

To prevail, the plaintiff must establish by a preponderance of the evidence that the debt arose from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny," or from a "willful" and "malicious" act causing injury to the plaintiff or its property.  11 U.S.C. §§ 523(a)(4) and 523(a)(6).

## II.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. § 1334(b).  This court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1), and the District Court's General Order of Reference dated September 21, 1984.  This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (I).  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable here pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## III.    PROCEDURAL HISTORY

This adversary proceeding arises out of the Debtor's voluntary Chapter 7 case commenced on September 19, 2018 (the "Petition Date").  ECF No. 1.  In Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 106), the Debtor listed the Partnership as a creditor holding an undisputed, unsecured claim for $5,893,588.35.  ECF No. 1, p. 21.  The Partnership's proof of claim ("POC 1-1") asserted a higher amount – $6,038,638 – and included a copy of a promissory note signed by the Debtor, dated

---

[2]    Citations to the docket in case no. 18-31552 are noted by "ECF No. __" Citations to the docket of this adversary proceeding, case number 18-3034, are noted as "AP-ECF No. ___".

January 16, 2015, along with a payment history (the "Note").  POC 1-1.  The payment history reflected pre-petition payments totaling $504,397 and accrued interest of $649,447.  POC 1-1.

Two months after the Petition Date, on December 24, 2018, the Office of the United States Trustee ("UST") filed a motion seeking to dismiss the Debtor's Chapter 7 case as abusive pursuant to §§ 707(b)(1) and (b)(3).  ECF No. 25.  The UST's motion largely turns on whether the Partnership's debt is a consumer or non-consumer debt.  Dismissal under § 707(b)(1) is not available if the debt is a non-consumer debt.  *See*, 11 U.S.C. § 707(b)(1), ECF No. 25, p. 4, ¶ 9.  The UST's motion is stayed at its request until this adversary proceeding is resolved.  *See*, ECF No. 45.

The Partnership commenced this adversary proceeding by filing a two-count complaint seeking a determination that a debt owed to it by the Debtor was non-dischargeable pursuant to §§ 523(a)(4) or 523(a)(6).  AP-ECF No. 1.  Almost one year after filing its original complaint, on November 7, 2019, the Partnership amended its complaint adding more factual support to its allegations, but not altering the statutory relief sought pursuant to §§ 523(a)(4) or 523(a)(6) (the "Complaint").  AP-ECF No. 95.  The Debtor denied all substantive allegations.  AP-ECF No. 111.

Trial was to start in early 2020, but plaintiff's counsel withdrew for reasons unrelated to this case and then the COVID-19 pandemic arrived.  AP-ECF Nos.  124, 125, 151, 159.  Eventually the trial was rescheduled for September 2020, and held using the ZoomGov video conference platform.  AP-ECF Nos.  176, 194, 198, 205, 231.[3]  Trial

---

[3]    The court established procedures to conduct a remote trial consistent with the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, and the Judicial Conference of the United States' authorization of March 31, 2020, allowing civil proceedings by teleconferencing.  AP-ECF No. 231; *see also*, https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-videoaudio-access-during-covid-19-

commenced on September 21, 2020, and continued on September 22, 23, and 30, 2020. AP-ECF Nos. 234, 235, 237, 238, 242.[4]  Five witnesses testified including: the Debtor; Helen McFeely; one of the Partnership's accountants, Kevin Sunkel; an attorney retained by the Partnership, Scott Jacobs, Esq.; and a financial advisor retained by the Partnership and expert witness, Richard Esposito.

Following trial, the parties submitted post-trial memoranda of law and reply briefs. AP-ECF Nos. 264, 265, 267, 268.  The Partnership argues its debt should be deemed non-dischargeable under all prongs of §§ 523(a)(4) and 523(a)(6) because the Debtor engaged in a multi-year scheme using Partnership funds as his own personal piggy bank. AP-ECF No. 264.  The Partnership also claims the Debtor's conduct amounted to intentional and malicious behavior and the court should discount his testimony as self-serving.  AP-ECF No. 264.  In particular, the Partnership highlights the Debtor's failure to document his intention to repay any of the funds withdrawn from the Partnership, failure to create any Partnership meeting minutes or resolutions, and failure to secure any liens or property in the Partnership's name as collateral for the alleged loans.  AP-ECF No. 264.  The Debtor argues any fraud claims were barred by statutes of limitations, that he never had an intent to deceive or cause harm, always intended to repay the Partnership, and only withdrew money to benefit his family, a purpose he believed fell within the Partnership's stated goals.  AP-ECF No. 265.  Final post-trial oral argument was held on February 21, 2021.  AP-ECF No. 269.

---

pandemic.  Additionally, at the defendant's request, third-party witnesses were sequestered for purposes of trial and were unable to access the trial or remotely participate by audio or video means during any other witness's testimony.  AP-ECF No. 231.

[4]       The transcripts are docketed as AP-ECF Nos. 249 to 252.

IV.    **FINDINGS OF FACT**

In accordance with Fed.R.Civ.P. 52 and Fed.R.Bankr.P. 7052, after consideration and analysis of the trial testimony, the documents admitted into evidence, and examination of the official record of the Chapter 7 case and the instant adversary proceeding, I find the following facts.

*The Debtor and Helen*

The Debtor is an attorney specializing in the area of intellectual property and admitted to practice before the United States Patent and Trademark Office and in the states of Connecticut and New York.[5]  Following his graduation from Albany Law School in 1992, the Debtor worked for a couple of years with his father's law firm; then for about two years with a Connecticut law firm, Cummings and Lockwood, and then, with his father's firm again until 2001.[6]  In 2001, the Debtor became senior patent counsel at the Crompton Corporation.[7]  The Crompton Corporation subsequently became known as Chemtura, a company specializing in specialty chemicals.[8]  The Debtor worked at Chemtura until 2007 when he left to start his own business.[9]  At some point after 2007, the Debtor started his own firm, Dilworth IP, LLC.[10]  The Debtor is currently with this firm.

Following the Debtor's law school graduation, he and Helen McFeely ("Helen") married in June of 1993.[11]  During their marriage, Helen was a homemaker and did not

---

[5]    AP-ECF No. 249, p. 26, L. 15-24; AP-ECF No. 251, p. 98, L. 14-18; AP-ECF No. 252, p. 93, L. 5-7.
[6]    AP-ECF No. 251, p. 99, L. 5-20.
[7]    AP-ECF No. 251, p. 99, L. 18-25, p. 100, L. 17-18.
[8]    AP-ECF No. 251, p. 100, L. 1-16.
[9]    AP-ECF No. 251, p. 101, L. 1-9
[10]    AP-ECF No. 249, p. 27, L. 1.
[11]    AP-ECF No. 95, ¶ 5; AP-ECF No. 111, ¶ 5; AP-ECF No. 250, p. 62, L. 13-15, p. 132, L. 2-5; AP-ECF No. 251, p. 97, L. 16-20.

5

earn income outside the home.[12]   In 1996, Helen and the Debtor purchased a home located at 35 Blue Spruce Circle, Weston, Connecticut for $290,000 (the "Blue Spruce property").[13]   At some point in 2001, Helen and the Debtor sold the Blue Spruce property and purchased a home located at 10 Fox Run, Easton, Connecticut (the "Fox Run property") for $879,000.[14]

### The Partnership and the Trusts

About five years after the marriage, on June 19, 1998, the Debtor became a general partner of The McFeely Limited Partnership (the "Partnership") holding a 0.045% membership interest.   He was 31 years old.[15]   The Partnership was created under the Delaware Revised Uniform Limited Partnership Act and registered in Delaware.[16]   In addition to the Debtor, the Partnership had two other general partners:

1)  Helen, also holding a 0.045% membership interest; and

2)  the McFeely Multigenerational Trust (the "Multigenerational Trust") holding a 0.91% membership interest.[17]

Helen's parents – Mary R. McFeely and James F. McFeely – created the Multigenerational Trust as an irrevocable trust for the benefit of their grandchildren and named the Debtor and Helen as co-trustees.[18]   The Debtor and Helen each made an initial capital contribution of $5,000 and the Multigenerational Trust initially contributed $100,000 into the Partnership.

---

12      AP-ECF No. 251, p. 101, L. 13-17, p. 102, L. 10-13.
13      AP-ECF No. 250, p. 109, L. 8-15; AP-ECF No. 251, p. 115, L. 16-25; AP-ECF No. 252, p. 88, L. 9-13.
14      AP-ECF No. 250, p. 109, L. 16-20, p. 110, L. 4-11.
15      AP-ECF No. 251, p. 104, L. 10-12.
16      AP-ECF No. 249, p. 27, L. 8-11; AP-ECF No. 250, p. 60, L. 18-20; AP-ECF No. 214-2.
17      AP-ECF No. 214-2; AP-ECF No. 251, p. 104, L. 18-22.
18      AP-ECF No. 249, p. 38, L. 8-15; AP-ECF No. 214-3, § 1.23. AP-ECF No. 251, p. 105, L. 12-14; AP-ECF No. 252, p. 74, L. 20-24.

The Partnership also included two limited partners:

1) the Mary R. McFeely Revocable Trust, holding a 49.5% membership interest; and,

2) the James F. McFeely Revocable Trust, holding a 49.5% membership interest (combined with the Mary R. McFeely Revocable Trusts, the "Revocable Trusts").[19]

Helen's parents created the Revocable Trusts for the benefit of Helen, her two sisters – Mary McFeely and Madeline McFeely – and their grandchildren. They named the Debtor and Helen as co-trustees.[20]  *See,* AP-ECF No. 250, p. 61, L. 8-9 (Helen's testimony regarding her sisters).  The main corpus of the Partnership funds came from the initial contributions of $5,445,000 by each of the Revocable Trusts.[21]  The Partnership held assets totaling approximately $11 million at inception.

Helen testified there were three main reasons for establishing the Partnership, including: 1) to obtain beneficial estate tax relief; 2) to pass on funds to future generations; and 3) to have a methodical and structured way to manage the inheritance within her family.[22]  The Partnership's stated business purpose was to own and manage investments, perform related acts, and do all things not otherwise illegal under the laws of Delaware.[23]  The Partnership Agreement included a non-exhaustive list of permissible business activities, including, in relevant part: to engage the issue of Helen's parents in management of the family assets; to establish an investment policy related to certain properties of the family which would be focused on growth as measured by total return;

---

[19]     AP-ECF No. 214-3, §§ 1.24, 1.25.
[20]     AP-ECF No. 249, p. 39, L. 6-10; AP-ECF No. 250, p. 25, L. 11-20; AP-ECF No. 251, p. 105, L. 19-20; AP-ECF No. 252, p. 31, L. 9-14; AP-ECF No. 214-3, §§ 1.24, 1.25.
[21]     AP-ECF No. 249, p. 37, L. 14-17, p. 38, L. 21-25, p. 39, L. 1-2; AP-ECF No. 214-3.
[22]     AP-ECF No. 250, p. 61, L. 3-9.
[23]     AP-ECF No. 214-2.

to manage investments in any other business without regard to the form in which the business was organized; to acquire general partnership interests or limited partnership interests in other partnerships and limited partnerships; and to engage generally in the real estate business.[24]

Partnership management had the authority to do or cause to be done a variety of tasks, including, in relevant part:

- buy, lease, or otherwise acquire real or personal property to carry on and conduct the Partnership's business;
- enter into any agreement for sharing of profits and joint venture with any person;
- manage, administer, conserve, improve, develop, operate, lease, utilize, and defend the Partnership assets;
- quitclaim, release or abandon any Partnership interests with or without consideration; and
- make loans to Partners.[25]

The Debtor believed this last power – to make loans to Partners – found in § 8.1 of the Partnership Agreement authorized him to make loans to himself.[26]   The Debtor asserted the Partnership made frequent distributions annually, if not monthly, of hundreds of thousands of dollars to its general or limited partners depending on the year and circumstances.[27]   When the Partnership made distributions – as compared to loans – to its partners, the funds were not required or intended to be repaid.   The only Partnership tax returns in the record reflect distributions of $31 in 2006 and $300,075 in 2007.[28]

From the Partnership's inception in 1998 until February 2012, the Debtor was the Partnership's managing general partner.[29]   The Debtor had never been a partner in a

---

[24]     AP-ECF No. 214-3, § 4.
[25]     AP-ECF No. 214-3, § 8.1.
[26]     AP-ECF No. 249, p. 75, L. 19-25, p. 58, L. 1-8, p. 111, L. 13-15.
[27]     AP-ECF No. 249, p. 156, L. 12-22.
[28]     AP-ECF No. 249, p. 180, L. 1-21; AP-ECF No. 215-29, p.4; AP-ECF No. 215-30, p. 5.
[29]     AP-ECF No. 251, p. 106, L. 5-7.

partnership and had no expertise in investing money, but he was willing to assume the managing partner role because Helen's time was occupied caring for their family.[30]  Helen explained that she and the Debtor had a "tacit understanding" about the division of labor in their marriage: she would care for the house and family's physical needs and the Debtor would take care of the family's finances and the Partnership's affairs.[31]   As the Partnership's manager, the Debtor was entitled to a management fee of $8,000 a month or $96,000 a year (the "Management Fee").[32]

The Debtor retained Owen J. Flanagan and Company, as the Partnership's accountants (the "Accountants") to assist him with the Partnership finances.[33]   The Accountants also performed services personally for the Debtor and Helen including personal tax preparation services.[34]

Helen chose not to be involved in the Partnership's finances, never spoke with the Accountants, left the Debtor to be the Accountant's primary contact, and did not make decisions regarding the Partnership until 2012.[35]

The 2006 and 2007 Partnership Form 1065 federal tax returns were prepared by the Accountants.[36]   The 2006 Partnership tax return states trade notes and accounts receivable started the year at $1,840,000 and ended the year at $1,912,000.[37]   The 2007

---

[30]     AP-ECF No. 251, p. 106, L. 8-18, p. 107, L. 6-7.
[31]     AP-ECF No. 250, p. 64, L. 8-22.
[32]     AP-ECF No. 249, p. 80, L. 13-21; AP-ECF No. 252, p. 49, L. 3-8.
[33]     AP-ECF No. 249, p. 130, L. 22-23, p. 131, L. 7-10.
[34]     AP-ECF No. 249, p. 131, L. 11-15; AP-ECF No. 252, p. 40, L. 15-22.
[35]     AP-ECF No. 249, p. 41, L. 18-24, p. 117, L. 2-4, 23-25, p. 118, L. 1, 6-11,p. 146, L. 18-25, p. 147, L. 1-10, p. 148, L. 11-15; AP-ECF No. 250, p. 70, L. 15-19.
[36]     AP-ECF No. 249, p. 148, L. 4-10.
[37]     AP-ECF No. 215-29, p.4.

Partnership tax return states trade notes and accounts receivable started the year at $1,912,000 and ended the year at $4,517,200.[38]

During the period from 1998 to 2012, Helen was not involved in the Partnership's finances. The Debtor never provided Helen with any written or oral reports regarding the Partnership's finances and despite being presented annually with the Partnership's tax returns, Helen never reviewed them before signing.[39] And, while the Debtor maintained a check register for a Partnership checking account, Helen never wrote any of the checks.[40]

### *Purchase of Abbey Road Property*

In 2004, after living in the Fox Run property for approximately four years, the Debtor and Helen started considering the purchase of a home located at 45 Abbey Road, Easton, Connecticut (the "Abbey Road property").[41] While the Debtor was interested in obtaining a larger home, Helen was reluctant because moving with kids could be a burden, but she changed her mind upon discovering the Abbey Road property.[42] In 2004, the Debtor and Helen had six children.[43] Eventually, the Debtor and Helen would have a total of eight children, with their youngest child arriving in 2008.[44] Several of their children faced special challenges and health issues including medical, behavioral, and learning disabilities.[45]

---

[38]    AP-ECF No. 215-30, p. 5.
[39]    AP-ECF No. 250, p. 65, L. 22-25, p. 66, L. 1-8.
[40]    AP-ECF No. 214-6; AP-ECF No. 249, p. 63, L. 11-23; AP-ECF No. 250, p. 71, L. 2-8.
[41]    AP-ECF No. 249, p. 13, L. 1-3, p. 84, L. 17-25; AP-ECF No. 250, p. 99, L. 10-12; AP-ECF No. 251, p. 111, L. 1-5, p. 112, L. 9-11.
[42]    AP-ECF No. 250, p. 68, L. 21-25, p. 69, L. 1-7, p. 77, L. 17-25.
[43]    AP-ECF No. 252, p. 78, L. 13-15.
[44]    AP-ECF No. 251, p. 103, L. 12-17, p. 104, L. 5; AP-ECF No. 252, p. 78, L. 16-18.
[45]    AP-ECF No. 250, p. 65, L. 8-21; AP-ECF No. 252, p. 7, L. 24-25, p. 8, L. 1, 9-14.

The purchase price for the Abbey Road property was $1,675,000.[46]  The Debtor believed this price was reasonable and the property would appreciate in value.[47]  The Debtor based his belief that the Abbey Road property would appreciate on his previous experience selling two properties for more than he paid to buy them, including property on Long Island, New York, and the Blue Spruce property.[48]  The Debtor could not recall to what extent the proceeds from the Long Island property exceeded the original purchase price, only that both the Long Island and the Blue Spruce properties sold for more than he had paid to buy them.[49]

During this time, the Debtor was working at Chemtura earning a salary of approximately $200,000 a year, plus earning the $96,000 per year Management Fee.[50]  The Debtor knew his large family's ordinary living expenses consumed all his income and that he did not have sufficient resources to service any debt incurred to purchase the Abbey Road property.[51]  Additionally, the Debtor believed the burden of moving with children would be eased if they were not required to sell the Fox Run property first.[52]  The Debtor proposed to Helen they borrow Partnership funds as a short-term bridge loan and repay the Partnership after the Fox Run property sold.[53]

In October of 2004, the Debtor and Helen withdrew approximately $1,800,000 from the Partnership to purchase the Abbey Road property (the "House Money").[54]  On

[46]     AP-ECF No. 251, p. 118, L. 22-23; AP-ECF No. 252, p. 6, L. 10-12.
[47]     AP-ECF No. 252, p. 75, L. 6-8, p. 78, L. 23-25.
[48]     AP-ECF No. 252, p. 88, L. 1-6, 9-13; AP-ECF No. 251, p. 115, L. 16-25.
[49]     AP-ECF No. 251, p. 115, L. 22-25, p. 116, L. 13-18.
[50]     AP-ECF No. 252, p. 6, L. 16-21.
[51]     AP-ECF No. 252, p. 6, L. 13-15, 22-25, p. 7, L. 1-3.
[52]     AP-ECF No. 250, p. 102, L. 1-17, p. 103, L. 1-21.
[53]     AP-ECF No. 250, p. 67, L. 19-25, p. 68, L. 1-4, p. 78, L. 19-22; AP-ECF No. 251, p. 113, L. 1-5.
[54]     AP-ECF No. 249, p. 13, L. 10-22, p. 14, L. 1-25, p. 15, L. 1-6, p. 86, L. 5-7, p. 90, L. 16-18; AP-ECF No. 251, p. 118, L. 1-4; AP-ECF No. 252, p. 3, L. 18-25, p. 4, L. 1-2, p. 117, L. 11-16.

November 15, 2004, the Debtor and Helen purchased the Abbey Road property for $1,675,000 using the House Money.[55]  Title to the Abbey Road property was held by the Debtor and Helen, and not the Partnership.[56]

Neither the Debtor nor Helen executed any document or promissory note evidencing an intent to repay the House Money to the Partnership.[57]  The Debtor testified he and Helen intended to pay interest on the House Money, but no terms were established for the alleged loan.  There was no document identifying an interest rate, a term or maturity date, or any installment payment amount.[58]  The Debtor testified he intended to pay the funds back either when they sold the Abbey Road property or when the Partnership wound up its affairs.[59]  Additionally, the Debtor stated he hoped to give the Partnership the benefit of any appreciation of the property over and above the purchase price amount.[60]  This vague intention was never documented other than the Partnership tax returns reflecting an accounts receivable due to the Partnership.[61]  At another point in the Debtor's testimony, he stated he planned to repay the House Money from cash flow generated by a car wash business.[62]  But, the first of two car wash businesses was not purchased until two years after the Abbey Road property purchase.  The Debtor's testimony that when he (and Helen) withdrew the House Money he already intended to purchase a car wash business and use its cash flow or profits to repay the House Money to the Partnership was not credible given the entirety of the evidence.  This credibility

---

[55]   AP-ECF No. 249, p. 16, L. 10-15; AP-ECF No. 252, p. 6, L. 10-12, p. 80, L. 12-14.
[56]   AP-ECF No. 249, p. 47, L. 20-24, p. 51, L. 22-25, p. 99, L. 19-20.
[57]   AP-ECF No. 249, p. 59, L. 11-14, p. 113, L. 20-24; AP-ECF No. 252, p. 4, L. 3-6.
[58]   AP-ECF No. 252, p. 4, L. 18-25, p. 84, L. 17-25.
[59]   AP-ECF No. 252, p. 4, L. 18-25.
[60]   AP-ECF No. 249, p. 123, L. 13-19.
[61]   AP-ECF No. 249, p. 123, L. 13-19; AP-ECF No. 252, p. 107, L. 3-6.
[62]   AP-ECF No. 252, p. 80, L. 7-11, 15-21.

determination, however, does not negate a finding the Debtor intended the House Money withdrawal to be a loan to be repaid.

### *Sale of Fox Run Property*

About four months after the Abbey Road property purchase, on March 21, 2005, the Debtor and Helen sold the Fox Run property for $959,700. [63]  The Debtor testified he "made money" of approximately $80,000 from the sale of Fox Run.[64]   The Debtor deposited the Fox Run property sale proceeds into a personal bank account and did not pay any of the funds to the Partnership.[65]  Helen testified that until 2012 she was unaware the Fox Run property sale proceeds had not been paid to the Partnership.[66]

### *The Car Wash Businesses*
### *Bridgeport Car Wash Purchase*

In mid-2006, the Debtor started seriously considering the purchase of a car wash business, although he had no experience in the car wash industry.[67]  The Debtor testified he hoped purchasing a car wash would enable him to repay the House Money to the Partnership, generate more income for his family, provide a place for his children to work in the future, and allow him to spend more time with his family.[68]  As due diligence, the Debtor spent approximately six months researching car washes online, contacting brokers, reviewing financial information packages from brokers, and purchasing an e-

---

[63]     AP-ECF No. 249, p. 15, L. 7-11, p. 85, L. 21-25, p. 86, L. 11-15.
[64]     AP-ECF No. 251, p. 114, L. 25, p. 115, L. 1, p. 116, L. 3-8; AP-ECF No. 252, p. 87, L. 23-25, p. 117, L. 23-25.
[65]     AP-ECF No. 249, p. 86, L. 16-20, L. 24-25, p. 87, L. 1.
[66]     AP-ECF No. 250, p. 80, L. 23-25, p. 81, L. 2-6, p. 84, L. 11-15.
[67]     AP-ECF No. 250, p. 76, L. 8-14
[68]     AP-ECF No. 252, p. 7, L. 7-15, p. 11, L. 18-20, p. 74, L. 9-10, p. 108, L. 8-10.

book about car washes.[69]  The Debtor also sat outside existing car washes counting cars to determine the number of cars a car wash business could wash within a given period.[70]

At some point at the end of 2006, the Debtor located a car wash to purchase in Bridgeport, Connecticut ("Bridgeport car wash").[71]  The Bridgeport car wash was located on Main Street in Bridgeport, Connecticut.  The proposed purchase was for the business, building, and equipment, but not the real estate and the Debtor was obligated to pay rent to the real estate owner.[72]

The Bridgeport car wash's records indicated its net income was approximately $1,000,000 per year and that it had been recently refurbished with new state of the art technology and equipment.[73]  In January of 2007, the Debtor created a limited liability company named Domaurea, LLC ("Domaurea").[74]  Helen and the Debtor held equal membership interests in Domaurea.[75]  The Partnership was not a member of Domaurea.[76]

In January of 2007, the Debtor purchased the Bridgeport car wash in the name of Domaurea for an amount somewhere between $2,000,000 and $2,500,000.[77]  The Debtor was unable to be more precise as to the purchase price.[78]  The funds for the purchase came from three sources, including: 1) the Fox Run property sale proceeds; 2) a

---

[69]     AP-ECF No. 252, p. 11, L. 4-8, p. 13, L. 13-19, p. 14, L. 19-20.  Merriam-Webster defines an "e-book" as "a book composed in or converted to digital format for display on a computer screen or handheld device."  Merriam-Webster.  ©  2022  Merriam-Webster,  Incorporated.  Available  online  at https://www.merriam-webster.com/dictionary/e-book.
[70]     AP-ECF No. 252, p. 15, L. 4-19.
[71]     AP-ECF No. 252, p. 11, L. 11-13
[72]     AP-ECF No. 252, p. 18, L. 15-17, p. 115, L. 5-12.
[73]     AP-ECF No. 252, p. 19, L. 2-12, p. 20, L. 22-24, p. 21, L. 10-14.
[74]     AP-ECF No. 252, p. 21, L. 18-20.
[75]     AP-ECF No. 252, p. 21, L. 25, p. 22, L. 1-3.
[76]     AP-ECF No. 252, p. 84, L. 3-6.
[77]     AP-ECF No. 252, p. 11, L. 11-13; p. 21, L. 15-20.
[78]     AP-ECF No. 252, p. 28, L. 3-13.

$1,000,000 loan secured by a mortgage on the Abbey Road property; and 3) seller financing in an amount between $500,000 to $1,000,000.[79]  At some point prior to the Bridgeport car wash purchase, the Debtor and Helen granted a mortgage of $1,000,000 on the Abbey Road property, but the Debtor could not recall the name of the bank that provided the funds.[80]  All of these mortgage proceeds were used to purchase the Bridgeport car wash.[81]  About this time in 2007, the Debtor left his position at Chemtura to focus on the car wash. [82]

### Stratford Car Wash Purchase

A few months later, in the late spring and early summer of 2007, the Debtor considered purchasing a second car wash located in Stratford, Connecticut (the "Stratford car wash").[83]  The Stratford car wash was close to the Bridgeport car wash and the Debtor believed by purchasing the second location he could spread out expenses and gain more market share.[84]  The Debtor engaged in a similar due diligence process as he did for the Bridgeport car wash when considering the Stratford car wash purchase, discovering that the Stratford car wash had a net income of over $500,000 a year.[85]  Prior to purchasing the Stratford car wash, the Debtor and Helen discussed – for approximately fifteen minutes while in their kitchen – borrowing money from Partnership to finance the purchase, and, while initially reluctant, Helen agreed.[86]

---

[79]     AP-ECF No. 252, p. 23, L. 12-20.
[80]     AP-ECF No. 252, p. 113, L. 7-16, p. 114. L. 1-2.
[81]     AP-ECF No. 252, p. 114, L. 3-5.
[82]     AP-ECF No. 252, p. 42, L. 2-5.
[83]     AP-ECF No. 252, p. 25, L. 3-10.
[84]     AP-ECF No. 252, p. 25, L. 9-17.
[85]     AP-ECF No. 252, p 25, L. 18-25, p. 26, L. 1-8, 20-24.
[86]     AP-ECF No. 249, p. 90, L. 22-25, p. 91, L. 1-6, p. 100, L. 3-9; AP-ECF No. 250, p. 69, L. 20-21; AP-ECF No. 252, p. 29, L. 8-24.

In July of 2007, the Debtor withdrew $1,875,000 from the Partnership for the Stratford car wash purchase (the "Car Wash Money").[87]  The Debtor testified he intended to repay the Car Wash Money with interest using the "profits" from the Bridgeport and Stratford car wash businesses, but had no specific interest rate in mind or term for repayment, other than assuming that the term would be for so long as he owned the businesses.[88]  The Debtor used the term "profit" and "income" interchangeably in his testimony to mean generally gross receipts less expenses rather than any accounting or tax definition of the term.  Like the House Money withdrawal, no terms for repaying the Car Wash Money withdrawal were established – such as an interest rate, maturity date, installment payment amount.  The Debtor did not execute any document or promissory note regarding the Car Wash Money.[89]  The Car Wash Money may be reflected in the Partnership's 2007 federal tax return as an account receivable.[90]

The Debtor used a different limited liability company named Caelos, LLC ("Caelos") to buy the second car wash.  The Debtor and Helen held equal membership interests in Caelos.[91]  The Partnership was not a member of Caelos.[92]  Caelos paid approximately $1,800,000 for the Stratford car wash.[93]  No explanation was provided for the discrepancy between the amount of Car Wash Money borrowed ($1,875,000) and the $1,800,000 purchase price for the Stratford car wash.  The Debtor believed this price to be reasonable and estimated he would be able to repay the Car Wash Money to the Partnership within six years if the Stratford car wash's operating proceeds were at least

---

[87]    AP-ECF No. 252, p. 30, L. 6-12.
[88]    AP-ECF No. 249, p. 123, L. 20-24; AP-ECF No. 252, p. 85, L. 5-14.
[89]    AP-ECF No. 249, p. 59, L. 15-18, p. 115, L. 1-3, p. 123, L. 20-25, p. 124, L. 1.
[90]    AP-ECF No. 215-30, p. 5.
[91]    AP-ECF No. 249, p. 99, L. 23-25; AP-ECF No. 252, p. 27, L. 8-10, p. 28, L. 16-22.
[92]    AP-ECF No. 249, p. 80, L. 2-3; AP-ECF No. 252, p. 84, L. 7-9.
[93]    AP-ECF No. 252, p. 27, L. 18-20, p. 29, L. 2-4, p. 116, L. 21-24.

$300,000 per year.[94]  The Debtor thought this was reasonable since it was $200,000 per year less than the net income reports he had reviewed prior to purchase.[95]

The Debtor's testimony lacked precision and varied regarding what he intended to do with any "profit" earned by the car washes.  In one instance he testified his intent was to turn over any "profit" or "income" to the Partnership after repaying the Car Wash Money.[96]  In another instance, he testified he intended to share the "profits" with the Partnership.[97]  While the Debtor's stated intentions are not necessarily inconsistent, they demonstrate a lack of clarity.  The Debtor presented no documentation supporting an intent to share "profit" with the Partnership.[98]  During the first part of 2007, the Bridgeport car wash performed in line with its historical performance, with revenue exceeding costs.[99]  However, none of these proceeds were paid to the Partnership.[100]

### The Car Washes Lose Money

Approximately a month after the Stratford car wash purchase, both car washes experienced a fifty percent downturn in gross revenue.[101]  The Debtor attributed the dramatic decline to the economic downturn known as the Great Recession.[102]  Both car washes lost money in 2007 and 2008, with combined losses in 2008 of approximately

---

[94]     AP-ECF No. 252, p. 30, L. 16-22, p. 85, L. 18-23; p. 116, L. 25, p. 117, L. 1-10; p. 120, L. 12-20.
[95]     AP-ECF No. 252, p. 75, L. 6-8; p. 120, 12-20.
[96]     AP-ECF No. 252, p. 30, L. 13-25, p. 31, L. 1-8, p. 108, L. 15-17.
[97]     AP-ECF No. 249, p. 111, L. 9-12, p. 115, L. 4-6.
[98]     AP-ECF No. 252, p. 32, L. 2-4, p. 86, L. 4-7.
[99]     AP-ECF No. 252, p. 25, L. 1-2.
[100]    AP-ECF No. 252, p. 91, L. 9-12.
[101]    AP-ECF No. 252, p. 32, L. 6-7, p. 34, L. 9-12, p. 35, L. 11-13.
[102]    AP-ECF No. 249, p. 175, L. 1-8; AP-ECF No. 252, p. 35, L. 3-10.  I take judicial notice pursuant to Fed.R.Evid. 201 noting the Great Recession began approximately in December 2007 and ended in about June 2009.   "The Great Recession."  Robert Rich, Federal Reserve Bank of Cleveland. https://www.federalreservehistory.org/essays/great-recession-of-200709; *see also*, AP-ECF No. 249, P. 172, L. 2-4, testimony from the Accountant, Kevin Sunkel, expressing his understanding that the Great Recession in the United States occurred in late 2007, 2008, and 2009; *see also*, AP-ECF No. 251, p. 15, L. 18-23.

$800,000.[103]  Amidst the car washes' financial struggles in 2008, the Debtor returned to the practice of law forming his own law firm, Dilworth IP, LLC.[104]  The car washes' financial performance never improved and combined they lost approximately $850,000 in 2009 and $600,000 in 2010.[105]  To cover operating expenses during this time, the Debtor withdrew additional funds from the Partnership.[106]  The Partnership's check register, AP-ECF No. 214-6, reflects checks written payable to Caelos in varying amounts including $1,000, $25,000, and $75,000.[107]  Only the Debtor and the Partnership's Accountants – due to their receipt of the Partnership's bank statements – knew of the additional withdrawals.[108]  No evidence was presented supporting a finding either that the Debtor concealed from or disclosed to the Limited Partners any of his withdrawals from the Partnership.

In 2010, the Debtor tried to sell the car washes, but received no offers.  Ultimately in March of 2011, the Debtor abandoned the car wash businesses and all their equipment to the landlords, who were the former sellers of the car washes.[109]  The Debtor did not try to liquidate any of the equipment or receive an offset for any rent due.[110]

### Additional Borrowing from Partnership

In addition to withdrawing the House Money and the Car Wash Money, the Debtor withdrew approximately $165,000 from the Partnership to cover special education

---

[103]    AP-ECF No. 249, p. 84, L. 6-11; AP-ECF No. 252, p. 37, L. 21-24.
[104]    AP-ECF No. 252, p. 42, L. 2-5, 16-25, p. 43, L. 1.
[105]    AP-ECF No. 252, p. 38, L. 14-21.
[106]    AP-ECF No. 249, p. 62, L. 25, p. 63, L. 1-3; AP-ECF No. 252, p. 38, L. 22-25, p. 39, L. 1.
[107]    AP-ECF No. 214-6, p. 2, 3; AP-ECF No. 249, p. 79, L. 16-23, p. 81, L. 22-25, p. 82, L. 1-2, 23-25, p. 83, L. 1-4.
[108]    AP-ECF No. 252, p. 40, L. 2-7.
[109]    AP-ECF No. 249, p. 84, L. 12-15; AP-ECF No. 252, p. 39, L. 5-17, 21-23, p. 46, L. 4-7.
[110]    AP-ECF No. 252, p. 116, L. 2-8.

expenses for his children.[111]   Helen consented to using Partnership funds to pay the tuition for three of their children to attend a therapeutic boarding school facility (the "School").[112]   One example of such spending is check number 127 written in the amount of $23,800 to the School.[113]   When the Debtor wrote the check, he did not execute any documents or promissory notes evidencing an intent to repay the Partnership.[114]

The Debtor also withdrew funds from the Partnership to purchase clothes, family vacations, and life insurance.[115]   The Partnership's check register reflects two checks for $1,427.82 and $1,290.29 written to Resort Realty for a family vacation and check numbers 108 for $20,800 and 109 for $8,766 written to "Pac Life" for the Debtor's life insurance premiums in which his wife and children are the named beneficiaries, not the Partnership.[116]   The Debtor did not sign a promissory note to the Partnership evidencing an intent to repay these amounts at the time he wrote these checks.[117]   He considered the investment in clothes as a professional expense to grow his law practice, which would assist in generating more income to pay back the Partnership.[118]   Similarly, the Debtor reasoned paying life insurance premiums and vacations benefited the Debtor's wife and children, and thus, fell within the ambit of the Partnership's goals.[119]

The Debtor withdrew unspecified amounts from the Partnership to support his law firm.[120]   Plaintiff's Exhibit 214-6 reflects one such instance where the Debtor wrote check

---

[111]   AP-ECF No. 249, p. 48, L. 8-11; AP-ECF No. 252, p. 44, L. 4-10.
[112]   AP-ECF No. 249, p. 106, L. 12-20, p. 109, L. 8-18; AP-ECF No. 250, p. 69, L. 11-15, p. 115, L. 4-8.
[113]   AP-ECF No. 249, p. 83, L. 10-16; AP-ECF No. 214-6, p. 3 of 4.
[114]   AP-ECF No. 249, p. 59, L. 23-25, p. 60, L. 1.
[115]   AP-ECF No. 249, p. 48, L. 12-15; AP-ECF No. 252, p. 49, L. 9-12.
[116]   AP- ECF No. 214-6; AP-ECF No. 249, p. 79, L. 12-15, p. 80, L. 22-25, p. 81, L. 1-10, p. 83, L. 5-9.
[117]   AP-ECF No. 249, p. 59, L. 19-25; p. 60, L. 1.
[118]   AP-ECF No. 252, p. 88, L. 22-25, p. 89, L. 1-3.
[119]   AP-ECF No. 252, p. 89, L. 5-25, p. 90, L. 1-2.
[120]   AP-ECF No. 249, p. 63, L. 4-10.

number 114 in the amount of $10,000 to Dilworth IP.[121]  Dilworth, IP did not provide legal services to the Partnership.[122]

### The February 2012 Meeting and Aftermath

In early 2012, the Accountants informed the Debtor the cash withdrawals from the Partnership could not continue and requested a meeting to discuss the loan balance owed.[123]  The Debtor insisted Helen attend the meeting despite her lack of interest in managing the Partnership.[124]  In February 2012, the Debtor, and Helen attended a meeting in New York with the Accountants, including Kevin Sunkel, and a principal of the company, Don Scherer (the "February Meeting").[125]

The Accountants informed Helen about the losses sustained by the car wash businesses and disclosed the "loans" the Debtor had taken from the Partnership totaling approximately $5,500,000.[126]  The Accountants provided a summary of the amounts the Debtor withdrew from 2003 through 2011, as reflected in the chart below:

| Year | Amount Withdrawn | Running Balance |
|---|---|---|
| 2003 | $20,000 | $20,000 |
| 2004 | $1,820,000 (Abbey Road purchase) | $1,840,000 |
| 2005 | $0 | $1,840,000 |
| 2006 | $72,000 | $1,912,000 |
| 2007 | $2,199,000 (Includes Stratford car wash purchase) | $4,111,000** |
| 2008 | $555,000 | $4,666,000 |
| 2009 | $689,000 | $5,355,000 |
| 2010 | $325,000 | $5,680,000 |
| 2011 | $164,000 | $5,572,000* |

---

121  AP-ECF No. 249, p. 82, L. 5-11.
122  AP-ECF No. 249, p. 82, L. 12-19.
123  AP-ECF No. 249, p. 132, L. 1-5; AP-ECF No. 252, p. 45, L. 11-15.
124  AP-ECF No. 250, p. 134, L. 2-12; AP-ECF No. 252, p. 47, L. 1-6.
125  AP-ECF No. 249, p. 132, L. 6-8; AP-ECF No. 252, p. 46, L. 19-21.
126  AP-ECF No. 249, p. 131, L. 16-24, p. 148, L. 11-25; AP-ECF No. 252, p. 46, L. 8-18, p. 47, L. 7-14.

*Includes credit of $292,000.  AP-ECF No. 214-5.
**No explanation was provided regarding the difference between this figure ($4,111,000) and the account receivable balance in the Partnership tax return for 2007 ($4,517,200).

The amounts shown in the chart do not include any interest.[127]  However, the total amount of $5,572,000 as of the end of 2011 includes a credit of $272,000, representing 34 months when the Debtor declined any Management Fee payments (from approximately March 2009 through the end of 2011).[128]  The Debtor waived receipt of the Management Fees in part due to his borrowing Partnership funds for personal expenses.[129]  The $5,572,000 figure reflects this credit.[130]

The Debtor never denied these funds were withdrawn and the Accountant, Kevin Sunkel, was unaware of the Debtor ever denying he needed to repay the funds.[131]  Mr. Sunkel testified he assisted in preparation of the Partnership's tax returns for the years 2006 and 2007 and reported the funds the Debtor withdrew as an account receivable of the Partnership.[132]  Another Accountant, Don Scherer, in 2007, prepared handwritten notes in advance of the Partnership's tax returns indicating certain sums, including the Car Wash Money, were loans to the Debtor.[133]

But, as of the February 2012 meeting, the Debtor had failed to repay any of the withdrawn amounts other than by declining thirty-four monthly management fees.[134]  During the February 2012 meeting, the Debtor agreed to immediately turn over the

---

[127]    AP-ECF No. 249, p. 148, L. 24-25, p. 149, L. 1.
[128]    AP-ECF No. 249, p. 149, L. 2-17, p. 159, L. 1-11, p. 185, L. 15-21.
[129]    AP-ECF No. 252, p. 49, L. 13-22.
[130]    AP-ECF No. 214-5; AP-ECF No. 249, p. 149, L. 5-1.
[131]    AP-ECF No. 249, p. 147, L. 21-23, p. 165, L. 5-7.
[132]    AP-ECF No. 249, p. 153, L. 1-18; p. 163, L. 16-25, p. 164, p. 1-22, p. 180, L. 5-24; AP-ECF Nos. 215-29, 215-30.
[133]    AP-ECF No. 215-21.
[134]    AP-ECF No. 249, p. 151, L. 10-13.

Partnership's management responsibilities to Helen and promised (orally) to repay the funds.[135]  The Debtor remained a general partner of the Partnership at this time.

Helen retained Richard Esposito ("Mr. Esposito") of Lighthouse Wealth Management ("Lighthouse") to assist in the management of the Partnership's finances.[136] Mr. Esposito is a chartered financial consultant specializing in financial planning and wealth management, a chartered life underwriter, and a retirement income certified professional.[137]  Both the Debtor and Helen also personally became clients of Mr. Esposito.[138]  During a February 2012 meeting between Helen and Mr. Esposito, Helen informed him she believed the Debtor's use of Partnership funds had been done in good faith.[139]  Later, in a phone conversation with the Debtor on March 26, 2012, Mr. Esposito noted his impression that the Debtor "was very forthcoming regarding his fault *vis-a-vis* bad decision-making" and the Debtor "explained that in the past, distributions were not properly done."[140]

At some point around May of 2012, Helen and the Debtor retained Attorney Scott Jacobs of S. H. Jacobs and Associates ("Attorney Jacobs"), as counsel.[141]  Helen and the Debtor sought counsel from Attorney Jacobs regarding how to address the amount of Partnership funds withdrawn, how to repay those amounts in a manner the Debtor could afford, and to prepare loan documentation and releases.[142]

---

[135]     AP-ECF No. 252, p. 48, L. 10-11, 14-16.
[136]     AP-ECF No. 250, p. 134, L. 13-15, p. 148, L. 8-12; AP-ECF No. 251, p. 8, L. 1-2; AP-ECF No. 252, p. 48, L. 17-19.
[137]     AP-ECF No. 250, p. 145, L. 1-4; AP-ECF No. 251, p. 3, L. 14-23.
[138]     AP-ECF No. 250, p. 148, L. 6-18.
[139]     AP-ECF No. 250, p. 134, L. 22-25, p. 135, L. 1, 17-19.
[140]     AP-ECF No. 214-8; AP-ECF No. 250, p. 162, L. 15-25; p. 163, L. 1-2.
[141]     AP-ECF No. 249, p. 193, L. 4-7, 21-25, p. 194, L. 4-12, p. 210, L. 18-24, p. 212, L. 1-8, 18-21.
[142]     AP-ECF No. 249, p. 193, L. 4-7, 21-25, p. 194, L. 4-12, p. 209, L. 21-23, p. 210, L. 18-24, p. 211, L. 10-21, p. 219, L. 1-2.

At some point after retaining Attorney Jacobs, Helen's sisters – who were beneficiaries of the Partnership – became aware of the amounts withdrawn from the Partnership and, in 2013, retained Attorney William Rohrer to represent their interests.[143] Towards the end of 2013, Attorney Rohrer began negotiating with Attorney Jacobs on how to address the funds taken by the Debtor.  This process was hotly contested.[144]

In December of 2013, the Debtor resigned as trustee for all trusts involving the McFeelys, including the Multigenerational Trust and the Revocable Trusts.[145]  At about the same time, the Debtor withdrew as a general partner of the Partnership.[146]  At some point at the end of 2013 or early 2014, the Debtor and Helen separated.[147]

### *The Promissory Note*

Attorney Jacobs drafted a promissory note to memorialize the Partnership funds borrowed by the Debtor.[148]  In 2014, prior to Attorney Jacob's drafting a note, the Debtor made payments of $60,000 to repay the Partnership.[149]  The Debtor executed the promissory note with a principal balance of $5,893,588.35 in favor of the Partnership on January 16, 2015 (the "Note").[150]  The Note included the applicable federal rate of interest with a 3.6% premium.[151]  The applicable federal rate is an interest rate applicable to loans between related parties.[152]  Attorney Jacobs indicated one reason related parties may

---

[143]    AP-ECF No. 249, p. 114, L. 6-9; AP-ECF No. 250, p. 27, L. 25, p. 28, L. 1-4, 11-13.
[144]    AP-ECF No. 250, p. 31, L. 3-6, p. 33, L. 16-20.
[145]    AP-ECF No. 214-14.
[146]    AP-ECF No. 95, ¶ 28; AP-ECF No. 111, ¶ 28; AP-ECF No. 214-14.
[147]    AP-ECF No. 250, p. 66, L. 16-17; AP-ECF No. 252, p. 92, L. 22-23.
[148]    AP-ECF No. 250, p. 27, L. 23-25; AP-ECF No. 252, p. 53, L. 3-8.
[149]    AP-ECF No. 252, p. 56, L. 2-9.
[150]    AP-ECF No. 214-15; AP-ECF No. 249, p. 15, L. 12-17; AP-ECF No. 250, p. 27, L. 23-25; AP-ECF No. 252, p. 52, L. 24-25, p. 53, L. 1-8.
[151]    AP-ECF No. 249, p. 176, L. 18-25, p. 177, L. 1-2.
[152]    AP-ECF No. 249, p. 177, L. 14-18; AP-ECF No. 250, p. 40, L. 13-19.

use the applicable federal rate of interest is so the Internal Revenue Service would be more likely to characterize the transaction as a true loan, rather than a gift.[153]

The Debtor testified he was unaware the Partnership would ever sue him for fraud or defalcation, and if he had known, he would not have signed the Note without hiring his own counsel because he never intended to commit fraud.[154]  It strains credulity that a practicing attorney like the Debtor would not consult with his own lawyer before signing a $5.8 million dollar note to his soon-to-be ex-wife's family's partnership.

### *The Divorce and Sale of Abbey Road Property*

About three months after the Note's execution, on April 13, 2015, Helen filed for divorce from the Debtor.[155]  The Superior Court entered a judgment of dissolution based upon Helen and the Debtor's separation agreement (the "Divorce Agreement") in February 2016.[156]  As part of the Divorce Agreement, Helen and the Debtor exchanged mutual releases of all claims against each other.[157]

In 2015, before the divorce was finalized, the Debtor and Helen sold the Abbey Road property.  The Abbey Road property sold at a lower price than the Debtor and Helen had paid to purchase it, generating proceeds of approximately $100,000 after satisfying mortgages.[158]  The proceeds were not paid to the Partnership.[159]

---

[153]     AP-ECF No. 250, p. 40, L. 20-24.
[154]     AP-ECF No. 252, p. 54, L. 13-21.
[155]     AP-ECF No. 215-15; AP-ECF No. 252, p. 56, L. 15-17; see also, Superior Court docket, *Helen Dilworth v. Michael Dilworth*, FST-FA-15-6025027-S.  The court takes judicial notice of the docket of the Superior Court case pursuant to Fed.R.Evid. 201.  The docket is available publicly online at: http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=FSTFA156025027S
[156]     AP-ECF No. 215-15; AP-ECF No. 249, p. 15, L. 18-23.
[157]     AP-ECF No. 250, p. 123, L. 2-10; AP-ECF No. 252, p. 63, L. 20-24; AP-ECF No. 215-15, Art. XI.
[158]     AP-ECF No. 249, p. 125, L. 5-7; AP-ECF No. 252, p. 20. L. 3-4, p. 41, L. 13-14, p. 92, L. 24-25, p. 93, L. 1.
[159]     AP-ECF No. 249, p. 16-18.

At some point following the divorce, the Debtor started considering filing a bankruptcy case because child support, alimony, and taxes consumed all his income, making payments under the Note impossible.[160]

### The Settlement Agreement

One year after the divorce and two years after the Note, on May 9, 2017, the Debtor, as former general partner of the Partnership and former trustee for several trusts, entered into a settlement agreement with Helen's sisters and Helen, individually, as trustee of several Trusts, and, as general partner of the Partnership (the "Settlement Agreement").[161]  The Settlement Agreement was the result of three years of negotiations between Attorney Jacobs and Attorney Rohrer, counsel for Helen's sisters.[162]

As part of the Settlement Agreement, Helen's sisters released the Debtor from all claims arising prior to the Settlement Agreement – with the exception of the amounts due under the Note.  Section 9 of the Settlement Agreement provided, in relevant part:

> General Release: Upon execution hereof, the parties to this Agreement hereby give the following general releases as part of this Agreement; and as set forth below without the need for the execution of any additional documents.
> (b) Except to the extent of and obligations created or reaffirmed herein, [Helen's sisters], … hereby release … [the Debtor] … from any and all claims, liabilities, demands, obligations, damages, lawsuits, debts … whatsoever, whether known or unknown … in law or equity … seeking damages, attorney's fees, litigation costs, injunctive, contractual, extra-contractual, declaratory or any other relief … or otherwise that [Helen's sisters] now has or may have in the future against [the Debtor] for any acts or omissions that may have occurred prior to the Effective Date of this Agreement … in any way related to the Trusts or the Partnership and the Loans.  However, nothing herein or in such releases shall release any person's obligations under this Agreement.
> AP-ECF No. 214-14, P. 10 of 75.

---

[160]    AP-ECF No. 252, p. 69, L. 17-23.
[161]    AP-ECF No. 214-14; AP-ECF No. 250, p. 31, L. 10-16.
[162]    AP-ECF No. 250, p. 31, L. 3-6, p. 33, L. 16-20.

The Settlement Agreement did not except from the release any claim against the Debtor other than the Note.[163]  The Partnership did not provide any release to the Debtor.

### Debtor Files Bankruptcy

Approximately eighteen months after the execution of the Settlement Agreement, on September 19, 2018, the Debtor filed a Chapter 7 bankruptcy petition.  ECF No. 1. The Debtor had made payments of over $500,000 pursuant to the Note prior to filing.[164] The Debtor's bankruptcy case is primarily a two-party dispute between the Debtor and the Partnership regarding its debt.  The only other debts listed by the Debtor include an unsecured debt of approximately $22,535.63 owed to a law firm and a contingent debt of an unknown amount owed to People's United Bank on a personal guaranty.  ECF Nos. 1, 24.

### Mr. Esposito's Expert Opinions

The Partnership presented testimony by Mr. Esposito as an expert witness to, "demonstrate that the Partnership suffered significant losses as a consequence of [the Debtor's] poor stewardship and improvident use of the Partnership's assets."[165]  Mr. Esposito hypothesized that had the Debtor not withdrawn the Partnership's funds, the money could have been invested, and, because it was not, the estimated earnings it could have made constituted a lost opportunity.[166]  Mr. Esposito estimated if the funds the Debtor withdrew from 2002 to January of 2012 had been invested, the funds could have earned the amounts shown in the following chart through December 31, 2018.[167]  Mr.

---

[163]    AP-ECF No. 214-14.
[164]    AP-ECF No. 252, p. 52, L. 14-20.
[165]    AP-ECF No. 264, p. 19.
[166]    AP-ECF No. 250, p. 171, L. 19-21, p. 187, L. 22-25.
[167]    AP-ECF No. 251, p. 22, L. 17-23.

Esposito indicated the date of December 31, 2018 had no special significance except that it was the last date for which he had information.

| Amount Funds Could Have Earned | Investment Strategy |
|---|---|
| $8,362,113.54 | If the withdrawn amounts had been invested in equities in the S&P 500.[168] This $8,362,113.54 figure does not include the amount "hypothetically invested" but only what could have been earned.[169] |
| $1,516,332.00 | If the withdrawn amounts had been invested solely in U.S. Government bonds.[170] Again, this $1,516,332 figure only reflects what could have been earned if the withdrawn amounts had been invested.[171] |
| $5,544,804.00 | If the withdrawn amounts had been invested in a portfolio consisting of 60% stocks and 40% intermediate U.S. Government bonds. Again, this $5,544,804 only reflects what could have been earned.[172] |

Mr. Esposito opined the Debtor's withdrawal of Partnership funds did not comport with the Partnership's investment policy outlined in § 4.6 of the Partnership Agreement requiring an investment policy focused on growth as measured by total return. Rather, the Debtor's withdrawals exceeded any growth of the remaining assets leading to a substantial decrease in the Partnership's value.[173]  Section 4.6 of the Partnership Agreement provided, in relevant part, that the Partnership was responsible for establishing:

> … an investment policy related to certain properties of the Family which are focused on growth as measured by total return rather than attempting to achieve a certain level of income or appreciation for any particular time

---

168    AP-ECF No. 250, p. 185, L. 20-23, p. 188, L. 7-14.
169    AP-ECF No. 250, p. 189, L. 1-17.
170    AP-ECF No. 250, P. 190, L. 12-18.
171    AP-ECF No. 250, P. 190, L. 12-20.
172    AP-ECF No. 250, p. 191, L. 11-13.
173    AP-ECF No. 250, p. 179, L. 7-18, p. 192, L. 3-8.

period, while providing a policy with respect to distributions to the Partners which promotes growth in the value of the Partnership assets.[174]

Mr. Esposito acknowledged the Partnership Agreement did not limit investments to certain strategies and permitted investments in many different types of assets.[175]  But despite the lack of limits, he did not believe the Partnership Agreement provided a general partner with authority – as an investment strategy – to invest partnership funds in a personal residence or a car wash business in which the Partnership had no interest.[176]  Mr. Esposito was not asked to opine on the profitability of a car wash; how the profitability of a car wash might compare with the S&P 500 or a bond market; or what the total return might be for a car wash.[177]

Mr. Esposito's opinion was limited to § 4.6 and did not include an opinion regarding §§ 4.8, 4.9, 8, 8.1 or 15.4.[178]  Section 15.4 provided, in relevant part:

> The doing of any act or the failure to do any act by a Partner or the Partnership, the effect of which causes any loss or damage to the Partnership, will not subject such Partner or the Partnership to any liability, if done pursuant to advice of the Partnership's legal counsel or in good faith to promote the Partnership's best interests.[179]

Mr. Esposito provided no insight on whether § 15.4 of the Partnership Agreement, limiting the liability of partners who act in good faith, impacted his opinion.  While Mr. Esposito's opinion appears reasoned, the court finds it of little value in the context of this case.  Mr. Esposito was qualified as an expert for wealth management and asked to opine on § 4.6 of the Partnership Agreement.  He did not draft the Partnership Agreement and

---

[174]   AP-ECF No. 214-3.
[175]   AP-ECF No. 251, p. 32, L. 8-13, p. 36, L. 16-19.
[176]   AP-ECF No. 251, p. 86, L. 5-17.
[177]   AP-ECF No. 251, p. 42, L. 10-19, p. 44, L. 4-11.
[178]   AP-ECF No. 251, p. 28, L. 7-8, p. 29, L. 11-13, p. 32, L. 20-22, p. 33, L. 18-20, p. 35, L. 5-7, p. 41, L. 3-19.
[179]   Pl. Ex. 214-3, p. 19 of 27.

28

was not a legal expert as to what was required generally under this particular Partnership Agreement.

## V.    **APPLICABLE LAW**

Before determining whether a debt is dischargeable, there must first be a debt. The Bankruptcy Code defines the term "debt" to mean "liability on a claim" and "claim" is broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated … matured, unmatured, disputed, undisputed ..."  11 U.S.C. §§ 101(5), (12).  The Supreme Court "has held even a right to payment that is not enforceable because the statute of limitations has expired is a claim, at least if the underlying non-bankruptcy law does not extinguish the right to payment."  2 *Collier on Bankruptcy* ¶ 101.05 (16th)(*citing, Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1411 (2017)).

In determining whether the Partnership holds a right to payment, the bankruptcy court must look to state law.  *See, Butner v. United States*, 440 U.S. 48, 57 (1979)(state law governs the substance of claims.).  In addition to defining the claim, I must consider whether any state law has extinguished the right to payment.  *In re Bak*, 10-23045 ASD, 2013 WL 653073, at *7 (Bankr. D. Conn. Feb. 20, 2013)("In other words, if non-bankruptcy law requires that a lawsuit to establish liability on any viable ground be brought prior to applicable statutes of limitation, and the creditor has not done so, then the debt cannot be established for non-dischargeability purposes.").

Here, the Partnership Agreement provides the parties' conduct shall be interpreted in accordance with Delaware law.  AP-ECF No. 214-3, § 15.5.  "[B]ankruptcy courts considering state law claims that do not implicate significant federal bankruptcy policy concerns should apply the choice of law rules of the forum state."  *In re Stanwich Fin.*

*Services Corp.*, 317 B.R. 224, 228 (Bankr. D. Conn. 2004)(*citing*, *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir.2001)); *see also, One40 Beauty Lounge LLC v. Sentinel Ins. Co.*, Docket No. 3:20-CV-00643 (KAD), 2021 U.S. Dist. LEXIS 216320, at *12 (D. Conn. Nov. 9, 2021) ("The threshold choice of law question . . . is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to the jurisdictions should be applied")(*citing, Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 F. App'x 81, 83 (2d Cir. 2001)).

And, even though the forum state here is Connecticut, I need not dwell on the question of whether it might be more appropriate to apply Connecticut law, because the same result follows with the application of either. *Philadelphia Indem. Ins. Co. v. 1961 Boston Post Rd. LLC*, 3:19-CV-01943 (TOF), 2021 WL 1783119, at *5 (D. Conn. May 4, 2021)("[U]nder Connecticut's choice-of-law rules, there is no need to perform a choice of law analysis if there is no outcome determinative conflict between applicable laws of the states with a potential interest in the case.")(Internal citations omitted).  Additionally, both parties agree the Partnership Agreement is governed by Delaware law.  AP-ECF No. 22, p. 22; AP-ECF No. 265, p. 3, 36 ("The [Partnership Agreement] is governed by Delaware law").

### *Statute of Limitations*

Under Delaware law, a claim for breach of fiduciary duty or fraud must be brought within three (3) years of the wrongful act.  10 Del. C. § 8106; *Jeter v. RevolutionWear, Inc.*, CV 11706-VCG, 2016 WL 3947951, at *9 (Del. Ch. July 19, 2016)("In Delaware, claims based in fraud are subject to a statute of limitation of three years."); *In re Tyson*

30

*Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007)(three-year statute of limitations applies to breaches of fiduciary duty); *Connecticut Investments LLC v. KDP, LLC,* 5:20-CV-179, 2021 WL 3519709, at *4 (D. Vt. Apr. 29, 2021)("Delaware is an 'occurrence' jurisdiction, meaning a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'")(*citing, ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020)).

Connecticut law is the same. "All common law tort claims, including claims for fraud, negligent misrepresentation, and breach of fiduciary duty, are subject to a three-year statute of limitations, which runs from the date of 'the act or omission complained of.' Conn. Gen.Stat. § 52–577." *In re Colonial Ltd. P'ship Litig.*, 854 F.Supp. 64, 90 (D.Conn.1994).

### *Looking Behind A Note or Judgment*

Even if a creditor reduces a claim to a state court judgment or enters into a settlement agreement resolving a claim, a bankruptcy court is not barred from inquiring into the true nature of the debt and whether – at its heart – the debt arose from fraudulent conduct. *Brown v. Felsen*, 442 U.S. 127 (1979). In *Brown*, the stipulated judgment provided the defendant would pay a set amount and never mentioned or referred to fraud. *Brown*, 442 U.S. 128-129. Nonetheless, the Supreme Court held the bankruptcy court correctly reviewed the underlying circumstances giving rise to the initial debt reasoning that barring such review would undercut Congress's intent that all debts arising out of fraud should be excepted from discharge and that bankruptcy courts, rather than state courts, should resolve questions of dischargeability. *Brown*, 442 U.S. 138 (noting a

31

bankruptcy court could consider whether or not a plaintiff's failure to press fraud allegations at an earlier time betrays a weakness in its case on the merits).

The Supreme Court revisited *Brown* in *Archer v. Warner*, 538 U.S. 314 (2003).  In *Archer*, the Supreme Court succinctly summarized the facts as follows:

> (1) *A* sues *B* seeking money that (*A* says) *B* obtained through fraud;
> (2) the parties settle the lawsuit and release related claims;
> (3) the settlement agreement does not resolve the issue of fraud, but provides that *B* will pay *A* a fixed sum;
> (4) *B* does not pay the fixed sum;
> (5) *B* enters bankruptcy; and
> (6) *A* claims that *B's* obligation to pay the fixed settlement sum is nondischargeable because, like the original debt, it is for "money … obtained by … fraud."
> *Archer*, 538 U.S. at 316-317.

The Supreme Court agreed the settlement and promissory note, coupled with the broad release language, released the underlying state law claim, and left *only* one relevant debt: a debt for money promised in the settlement agreement itself.  *Archer*, 538 U.S. at 318-319.  But the Supreme Court concluded the settlement agreement's new promise to pay did not foreclose bankruptcy court review of the underlying circumstances that gave rise to the initial debt.  *Archer*, 538 U.S. at 321 ("A debt embodied in the settlement of a fraud case 'arises' no less 'out of' the underlying fraud than a debt embodied in a stipulation and consent decree.").  The Supreme Court found the settlement agreement – like the stipulated judgment in *Brown* – did not change the nature of the debt for dischargeability purposes, allowing the bankruptcy court to weigh all the evidence when evaluating whether the debt was non-dischargeable pursuant to § 523(a)(2)(A).  The Supreme Court specifically rejected the idea espoused by Justice Thomas in his dissent that the settlement agreement worked a sort of novation severing the connection between the debt and the fraud and leaving the only a contractual debt

voluntarily obtained by the parties' agreement for the bankruptcy court to review. *Archer*, 538 U.S. at 327-328 (dissenting opinion).

The Supreme Court's reasoning in *Archer* has been extended to cases seeking a determination of non-dischargeability under § 523(a)(4). *See, In re DeTrano*, 326 F.3d 319 (2d Cir. 2003)("The reasoning of *Archer* nonetheless controls the outcome here"). "The general principle of *Brown* and *Archer* – that bankruptcy courts should examine the underlying nature of a debt, no matter what its form, when the dischargeability of the debt is in question – has been followed" and routinely extended. *Burrell-Richardson v. Massachusetts Board of Higher Education (In re Burrell-Richardson)*, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006)(concluding a student loan obligation did not change its underlying non-dischargeable characteristics after a creditor obtained a default judgment based on nonpayment); *Musich v. Graham (In re Graham)*, 455 B.R. 227, 233 (Bankr. D. Colo. 2011)(extended to debts for willful and malicious injuries under § 523(a)(6)); *Ramey v. Barton (In re Barton)*, 321 B.R. 869, 874 (Bankr. N.D. Ohio 2004)(extended to include obligations arising from divorce and separation agreements under § 523(a)(15)). "[B]ankruptcy courts must focus on the conduct from which the debt at issue originally arose, even though the debt may subsequently have taken on other documentary forms as a result of litigation, administrative proceedings or settlement negotiations." *In re Pierce*, 563 B.R. 698, 707 (Bankr. C.D. Ill. 2017)("This issue is decided as a matter of federal law, which preempts general principles of state novation and preclusion law to the contrary.").

### *Dischargeability of Debts Under § 523(a)(4)*
### *Burden of Proof*

Congress identified certain circumstances in Bankruptcy Code § 523 "where considerations of public policy, fairness, and equity may lead to a denial of the dischargeability of a particular debt." *In re Dvorkin*, 19-41157-ESS, 2020 WL 930098, at *6 (Bankr.E.D.N.Y. Feb. 26, 2020). As relevant here, § 523(a)(4) excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "A creditor seeking to establish nondischargeability under § 523(a) must do so by the preponderance of the evidence." *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006)(*citing, Grogan v. Garner*, 498 U.S. 279 (1991)). "The burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence ..." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137, n.9 (1997)(internal citations omitted). "As the finder of fact, the Court is entitled to make credibility findings of the witnesses and testimony." *In re Levin*, 8-17-77330-LAS, 2020 WL 1987783, at *2 (Bankr. E.D.N.Y. Apr. 24, 2020)(Internal citations omitted).

### *Fraud and Defalcation*

To prevail on a § 523(a)(4) claim for fraud or defalcation, a plaintiff must first establish a debtor was acting in a fiduciary capacity. *See, In re Smallwood*, 20-42708-NHL, 2021 WL 4465560, at *7 (Bankr. E.D.N.Y. Sept. 28, 2021)("The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been made")(*citing*, *In re Nofer*, 514 B.R. 346, 353–54 (Bankr.E.D.N.Y. 2014)). "The Bankruptcy Code does not define the term 'fiduciary'" and courts look to federal law to determine its meaning. *In re Peters*, 18-50125

(JAM), 2020 WL 1189331, at *4 (Bankr.D.Conn. Mar. 5, 2020).  A "fiduciary relationship under § 523(a)(4) generally involves express trusts, technical trusts or statutorily imposed trusts."  *In re Tashlitsky*, 492 B.R. 640, 644 (Bankr. E.D.N.Y. 2013).  For instance, there is no cause of action under § 523(a)(4) based on the existence of a constructive or resulting trust because those types of trusts serve as remedies for another's breach of duty.  *Guerra v. Fernandez–Rocha (In re Fernandez–Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006)("'[C]onstructive' or 'resulting' trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception 'because the act which created the debt simultaneously created the trust relationship.'").

In the context of § 523(a)(4), the Second Circuit has indicated two parties are in a fiduciary relationship when there is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter."  *In re Hayes*, 183 F.3d 162, 167 (2d Cir. 1999); *see also, In re Snyder*, 939 F.3d 92, 101 (2d Cir. 2019)("[T]he defalcation exception is not limited to express trusts," rather, the exception applies where there is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter.").

The fiduciary requirement of § 523(a)(4) may also include relationships in which trust-type relationships are forged under state statutory or common law.  *In re West*, 339 B.R. 557, 566 (Bankr.E.D.N.Y. 2006).  "[S]tate law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4)."  *Hayes*, 183 F.3d at 166.  The requisite fiduciary capacity needed for § 523(a)(4) has been found, for example, based on an attorney-client relationship (*Hayes*, 183 F.3d at 162); the

duty owed by a corporate officer or director to shareholders (*Nofer*, 514 B.R. at 354); and the duty owed by a managing member and chief executive officer of a limited liability company to other members (*Currie v. Sanchez (In re Sanchez),* 2016 WL 5376189, at *4, 2016 Bankr. LEXIS 3481, *13 (Bankr. S.D.N.Y. Sept. 26, 2016)).

Under Delaware law, a general partner serves as a fiduciary to a partnership and its limited partners.  In this case, § 15.5 of the Partnership Agreement provides it is to be interpreted under Delaware law.  AP-ECF No. 214-3.  Accordingly, Delaware law is relevant to whether the Debtor is a fiduciary.  "As a fiduciary, and absent contractual modification, a general partner's duties to limited partners and the partnership parallel those exercised by directors of Delaware corporations."  *Dohmen v. Goodman*, 234 A.3d 1161, 1167 (Del. 2020); *see also*, *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002) (Absent a contrary provision in the partnership agreement, "a general partner owes the traditional fiduciary duties of loyalty and care to the limited partnership and its partners."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012)("[T]here has never been any serious doubt that the general partner of a Delaware limited partnership owes fiduciary duties").

For purposes of § 523(a)(4), defalcation is the misappropriation or misuse of property or funds entrusted to a fiduciary.  *In re Wizenberg*, 20-11616, 2021 WL 777142, at *5 (11th Cir. Mar. 1, 2021).  Defalcation requires "a culpable state of mind," specifically, "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  *In re Snyder*, 939 F.3d at 102 (*citing, Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013)).  The Supreme Court in *Bullock* observed its decision resolved a split among the courts of appeal on the level of intent required for a breach of

fiduciary duty to constitute "defalcation."  *Bullock*, 569 U.S. at 271 (collecting cases and comparing the positions of the 4th and 9th Circuits (finding negligence or innocent mistake sufficient for defalcation) with the 1st and 11th Circuits (requiring a showing closer to extreme recklessness for defalcation)).  *Bullock* supersedes the Fifth Circuit's decision in *In re Moreno*, 892 F.2d 417 (5th Cir. 1990), relied on by the Partnership.

A fiduciary's conduct is reckless where "the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty."  *Bullock*, 569 U.S. at 274 (The conduct to render a debt non-dischargeable under § 523(a)(4) must be similar to reckless conduct of the kind set forth in the Model Penal Code or which criminal law often treats as equivalent to intentional conduct).  Conscious disregard has, in turn, been defined to involve "a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation."  *Bullock*, 569 U.S. at 274 (*emphasis* in original)(*citing, Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12 (1976)(defining scienter for securities law purposes as a mental state embracing "intent to deceive, manipulate, or defraud")).

This standard "insures that the harsh sanction of non-dischargeability is reserved for those who exhibit some portion of misconduct," without "reach[ing] fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable."  *In re Snyder*, 939 F.3d at 102 (*citing, In re Hyman*, 502 F.3d 61, 68-69 (2d Cir. 2007)).  "Mere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute a 'defalcation' within

the meaning of section 523(a)(4)." *In re Deutsch*, 575 B.R. 590, 601 (Bankr. S.D.N.Y. 2017).

Fraud pursuant to § 523(a)(4), "has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud." 4 *Collier on Bankruptcy* ¶ 523.10[1][b], 532-71 (16th).  The Bankruptcy Code "incorporates the common law elements of fraud, 'includ[ing] a false representation, scienter, reliance, and harm.'" *In re Deutsch*, 575 B.R. at 601 (*citing, Nofer*, 514 B.R. at 355).

### *Larceny*

Bankruptcy Code § 523(a)(4)'s phrase "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny." *Bullock*, 569 U.S. at 275.  "Larceny, for purposes of section 523(a)(4), is 'the fraudulent and wrongful taking and carrying away of the property of another with the intent to convert the property to the taker's use without the consent of the owner." *In re Veneziano*, 615 B.R. 666, 678 (Bankr.D.Conn. 2020). To constitute larceny "a defendant must possess the unlawful intent at the time of the original taking." *In re Daffner*, 612 B.R. 630, 652 (Bankr.E.D.N.Y. 2020).

### *Embezzlement*

Embezzlement, under § 523(a)(4), "is determined based on federal common law," *3N Int'l, Inc. v. Carrano (In re Carrano)*, 530 B.R. 540, 558 (Bankr.D.Conn. 2015), and has been defined repeatedly as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Conn. Attorneys Title Insurance Co. v. Budnick (In re Budnick)*, 469 B.R. 158, 176 (Bankr.D.Conn. 2012)(internal citation omitted).  "The Plaintiff must establish three elements to sustain a claim under § 523(a)(4) for embezzlement: (1) the debtor rightfully

possessed another's property; (2) the debtor appropriated the property for use other than the use for which the property was entrusted; and (3) the circumstances implied a fraudulent intent." *In re Daffner*, 612 B.R. at 651 (internal citations omitted).  Different than larceny, to constitute embezzlement, the original taking of the property must be lawful, or, with the consent of the owner. *See, In re Fiano*, 15-21410 (AMN), 2017 WL 1207415, at *5 (Bankr.D.Conn. Mar. 31, 2017)(internal citations omitted).

### *Debts for Willful and Malicious Injury Under § 523(a)(6)*

To prevail on its § 523(a)(6) claim, the Partnership must show, by a preponderance of the evidence, the debt arose from a "willful" and "malicious" act which caused injury to it or to its property.  11 U.S.C. § 523(a)(6); *see also*, *Ball*, 451 F.3d at 69.  "The terms 'willful' and 'malicious' are separate elements, and both elements must be satisfied." *In re Margulies*, 541 B.R. 156, 161 (Bankr.S.D.N.Y. 2015) (internal citations omitted).  The Supreme Court, in *Kawaauhau v. Geiger*, held a non-dischargeable debt under § 523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also*, *In re Margulies*, 541 B.R. at 161–62 ("To prove that a debtor acted willfully under 11 U.S.C. § 523(a)(6), the plaintiff must demonstrate that the debtor deliberately intended to injure the plaintiff").  Willfulness "includes conduct that the actor is substantially certain will cause injury." *In re Mitchell*, 227 B.R. 45, 51 (Bankr.S.D.N.Y. 1998).

The Supreme Court further held that exceptions to discharge under § 523(a)(6) should not be construed so broadly that even a "knowing breach of contract could ... qualify." *Kawaauhau*, 523 U.S. at 62; *see also,* 4 *Collier on Bankruptcy* ¶ 523.12 ("Courts must be careful not to equate a breach of a contract … with conduct causing willful and

39

malicious injury."); *compare*, *In re Mavrelis*, 18-46430-ESS, 2020 WL 5883405, at *22 (Bankr.E.D.N.Y. Oct. 1, 2020)(injury is a broad concept including the lost opportunity to realize substantial benefits from a real estate tax abatement).   "[D]ebts arising from recklessly or negligently inflicted injuries" are outside the scope of § 523(a)(6)." *Kawaauhau*, 523 U.S. at 64.

"Malicious" in this context means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Ball*, 451 F.3d at 69 (*citing, In re Stelluti*, 94 F.3d 84, 87 (2d Cir.1996)).   "Malice may be implied by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Ball*, 451 F.3d at 69. "[A]ctual malice may be inferred or imputed, for example, from the fact that the debtor's conduct giving rise to liability has no potential for economic gain or other benefit to the debtor, from which one could only conclude that the debtor's motivation must have been to inflict harm upon the creditor." *In re Luppino*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998) (holding that commercial bribery and breach of fiduciary duty lacked requisite malice). "[A] knowing breach of contract generally does not satisfy the malicious element of § 523(a)(6) absent 'some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code.'" *In re Khafaga*, 419 B.R. 539, 550 (Bankr.E.D.N.Y. 2009) (*quoting, Luppino*, 221 B.R. at 700).

## VI.   DISCUSSION

The record here is sparse as to the Partnership's innerworkings from 1998 through 2011 and provides a disjointed view of what transpired with the Partnership's funds.   And, although there was testimony – generally – that disbursements or loans were made to

others besides the Debtor, there was a lack of information regarding amounts or frequency.  The Debtor admitted two years of Partnership tax returns into evidence – for 2006 and 2007, however it is impossible to properly evaluate much about the returns given the paucity of information about the Partnership's tax history and attributes.  Neither party provided specific details about either the Debtor's or Helen's personal taxes.  The Debtor, an attorney by trade and former managing member of the Partnership, surprisingly provided very little detail about significant aspects of his withdrawals totaling more than $5,000,000, purchases and sales of real estate, and the financial performance of his car wash businesses.  Helen's testimony revealed that as a general partner, she was aware of some of the Partnership withdrawals, consented to others, but was generally unaware or untroubled by the source of the funds needed to maintain her large household or the holdings and operation of the Partnership.  Few facts were introduced supporting the idea that the Debtor used Partnership funds for his exclusive use, as opposed to the use of his family.  One of the most important documents here – the Partnership Agreement – is broad in its grant of authority to the Debtor as managing partner.  With this backdrop, I have considered the Debtor's conduct, whether it fell within the authority granted by the Partnership Agreement, and whether it constitutes conduct rendering the debt non-dischargeable.

### *The Debtor owes the Partnership a Debt*

The Debtor asserts any claims for breach of fiduciary duty or fraud long expired under either Delaware's or Connecticut's statute of limitations and so there is nothing for the court to determine non-dischargeable.  I agree there appears to be no viable state law claim for fraud or breach of fiduciary duty.  Plaintiff's Exhibit 214-4 indicates the

Debtor's last withdrawal of funds occurred in January 2012. There is no more exact date for when the Debtor withdrew funds except the month of January. Three years from the last withdrawal (January 2012) is January 2015. There is no evidence the Plaintiff – or any party – brought an action for breach of fiduciary duty or fraud by or before January 2015. The Partnership does not assert any tolling doctrine applies extending the statute of limitations. Thus, any state law-based claim has expired, and, correspondingly, damages for state law claims – such as lost opportunity cost – are unavailable.

And, if the Debtor filed bankruptcy at a time when no promissory note existed or when he denied he owed money, it might be reasonable to conclude there was no debt.

But, here, the Debtor admits he owes the debt, at least as described in the Note. The Debtor made material payments on his debt to the Partnership prior to and after the execution of the Note, from 2014 through 2018.[180] The Debtor consistently testified he owed almost $6 million to the Partnership on the Petition Date. When questioned about what he had said in the February 2012 meeting with the Accountants and Helen, the Debtor testified he, "confirmed [his] intention to repay the loan."[181] As part of this bankruptcy, the Debtor scheduled the Partnership as the holder of a non-contingent, undisputed, unsecured claim based upon a default on a promissory note in Schedule E/F. ECF No.1, p. 21. "A debtor's scheduling of a debt constitutes a sworn statement and admission against interest, which is strongly probative of the claim's validity." *In re Live Primary, LLC*, 626 B.R. 171, 189 (Bankr.S.D.N.Y. 2021). It would be inconsistent to conclude no debt exists when the uncontroverted evidence shows the Debtor intended to

---

[180] POC 1-1, p. 9-10; AP-ECF No. 252, p. 52, L. 14-20, p. 55, L. 22-25, p. 56, L. 1-9.
[181] AP-ECF No. 252, p. 48, L. 14-16.

repay the Partnership funds, executed a Note promising to repay the funds, and made payments on the debt.  The Debtor owes a debt to the Partnership.

However, because the debt owed to the Partnership is not based upon a state law claim for breach of fiduciary duty or fraud, the debt does not include damages for any lost opportunity cost for investments as opined by Mr. Esposito.

### The Court Can Examine The Conduct Giving Rise to a Debt

Guided by the Supreme Court's decisions in *Brown* and *Archer* and their progeny, I conclude Congress's intent under § 523(a) was for courts to examine the conduct from which the debt originally arose to ensure all debts arising from fraud are excepted from discharge.  *See, In re Pierce*, 563 B.R. at 707 ("bankruptcy courts must focus on the conduct from which the debt at issue originally arose, even though the debt may subsequently have taken on other documentary forms").  Here, the Note may be the debt's current form but, the circumstances giving rise to the debt are the events surrounding the Debtor's withdrawal of the House Money, the Car Wash Money, and the other substantial withdrawals of cash from the Partnership during the period 2003 through 2011.  The question now is whether the debt flowing from the Debtor's conduct during that time is non-dischargeable under §§ 523(a)(4) or (a)(6).

### Lack of Evidence Regarding Intent

To succeed on the § 523(a)(4) claims, the Partnership must prove it is more probable than not the Debtor

1) possessed a wrongful intent when he withdrew Partnership funds to constitute a defalcation or fraud; or

2) possessed a fraudulent and wrongful intent when he withdrew Partnership funds for his conduct to constitute larceny; or

3) developed a fraudulent intent after he withdrew Partnership funds for his conduct to constitute embezzlement.

Similarly, for the Partnership to prevail on its § 523(a)(6) claims, it must prove the Debtor deliberately intended to injure the Partnership or his conduct was substantially certain to injure the Partnership (*i.e.,* the "willful element") and his conduct was without just cause or excuse (*i.e.,* the "malicious element").

### *Debtor is a Fiduciary for Purposes of § 523(a)(4)*

As a preliminary consideration for either fraud or defalcation pursuant to § 523(a)(4), the Partnership must prove the Debtor was a fiduciary.  This requirement is satisfied.  Both Delaware common law and the facts established at trial inform the conclusion the Debtor was a fiduciary to the Partnership and its limited partners. Delaware common law views the Debtor as a fiduciary with respect to the Partnership and the limited partners because of his position as general partner.[182]  Further, the undisputed facts here demonstrate the Debtor served as, and benefitted from being, a fiduciary.  The Debtor was the Partnership's managing partner for all relevant times and was compensated with a sum of $8,000 a month for that responsibility and position through approximately March of 2009 when he declined to be compensated.

The Debtor argued he was not a fiduciary because he possessed no greater knowledge or power as between himself and Helen and they were simply husband and wife.[183]  The Debtor's argument is unpersuasive and misstates who the plaintiff is in this action.  The court is not tasked with determining if the Debtor was a fiduciary as between himself as an individual, and, Helen, as his then-wife.  Rather, the question is if the Debtor,

---

[182]    *See, Dohmen v. Goodman*, 234 A.3d 1161 (Del. 2020).
[183]    AP-ECF No. 265, p. 24-25.

acting as the managing general partner, stood in a fiduciary position in relation to the Partnership and the other partners when engaging in the conduct giving rise to this action. To this question, the answer is yes.

### *Defalcation Pursuant to § 523(a)(4)*

But, even if the Debtor was a fiduciary, the Partnership failed to satisfy its burden of proving the Debtor committed defalcation. Defalcation requires a showing of knowing misbehavior or gross recklessness. *In re Snyder*, 939 F.3d at 102; *see also, Bullock*, 569 U.S. at 274 (conduct that is "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."). Defalcation under § 523(a)(4) does not equate to negligence. *See, In re Deutsch*, 575 B.R. 590, 601 (Bankr. S.D.N.Y. 2017)("Mere negligence, without some element of intentional wrongdoing, breach of fiduciary duty or other identifiable misconduct, does not constitute a 'defalcation' within the meaning of section 523(a)(4)."). Here, on multiple occasions, the Debtor testified he believed the Partnership Agreement permitted loans and that he intended to repay the money borrowed.[184] The Partnership Agreement contained very few limits on a managing member's authority; provided the managing member with the authority to "make loans to Partners" and exculpated a partner from any loss if the act was done "in good faith to promote the Partnership's best interests."[185] Nothing in the Partnership Agreement provided clarity regarding under what conditions loans could be made to partners or what terms or documentation was required for loans. There was no specific provision requiring security be held by the Partnership if a loan to a partner was made. In comparison, the

---

[184]    AP-ECF No. 249, p. 75, L. 19-25, p. 58, L. 1-8, p. 111, L. 13-15.
[185]    AP-ECF No. 214-3, §§ 8.1(18), 15.4.

Partnership Agreement did place limits on the distributions – as compared to loans – made to partners.[186]

The Debtor further testified he borrowed the funds to provide a better home for his family; start businesses for his children; send his children to specialized schools; and sustain his law firm.  He believed these goals fell within the scope of the Partnership's purpose of providing for Helen's parents' heirs.[187]

The accountant Kevin Sunkel's testimony and the accountant Don Scherer's handwritten notes combined with Schedule L of the 2006 and 2007 Partnership tax returns provide sparse, but contemporaneous, evidence of reporting to the Internal Revenue Service that the funds the Debtor withdrew were an account receivable of the Partnership.[188]

The Partnership failed to contradict this evidence.  Instead, the Partnership argues the court should discount the Debtor's testimony as self-serving and should rely on the absence of evidence – the absence of any promissory notes at the time of the withdrawals and the absence of any written intent to repay – to establish intent.  But the Partnership's burden is to show evidence that it is more probable than not that the defendant had a wrongful intent.  The absence of evidence like promissory notes or a writing is insufficient.

The Partnership additionally argues the court should credit Mr. Esposito's expert testimony that the Debtor's taking of funds failed to comport with § 4.6 of the Partnership Agreement.  But the failure to comport with the Partnership Agreement is insufficient for § 523(a)(4).  Mr. Esposito's opinion falls short of opining that the Debtor's conduct was a

---

[186]    AP-ECF No. 214-3, §1.9.
[187]    AP-ECF No. 252, p. 7, L. 7-15, p. 74, L. 9-10, p. 89, L. 5-25, p. 90, L. 1-2, p. 108, L. 8-10.
[188]    AP-ECF No. 249, p. 153, L. 1-18; AP-ECF Nos. 215-29, 215-30.

gross deviation.  I note his opinion was limited to one section of the Partnership Agreement, rather than its provisions as a whole.  Due to these deficiencies, I find his opinion of little value in determining whether a defalcation occurred.

I am unpersuaded the evidence establishes the Debtor's conduct rose to the level described by the Supreme Court in *Bullock* as a "gross deviation from the standard of conduct."  For the absence of doubt, I am not condoning or endorsing the Debtor's conduct, but I am concluding the evidence presented does not support the conclusion the Debtor engaged in conduct meeting the definition of defalcation under § 523(a)(4).  This case does not present a story – which unfortunately this court has seen in other cases – of a fiduciary engaging in a fraudulent scheme to siphon money out of a trust, partnership, or business with the sole intent of personal gain, concealment of the withdrawals, and with a conscious disregard to those who might be injured by their actions.  For example, there is no indication the funds were withdrawn to purchase private yachts or vacation homes, to feed a gambling addiction, or to otherwise self-serve the Debtor's interests.  Rather, the testimony was the funds were used with the intent to maintain the ten-person family's needs and standard of living.  Helen – a general partner in the Partnership – admitted she knew of (and approved of) the House Money withdrawal and the Car Wash Money withdrawal.  And, while the Debtor's testimony was self-serving, it was also uncontroverted.  Based upon this record lacking evidence of a wrongful or fraudulent intent, I cannot conclude the evidence demonstrates the Debtor acted with such gross negligence or reckless disregard that the Partnership's debt be deemed non-dischargeable pursuant to § 523(a)(4).

### *Fiduciary Fraud*

If the Debtor – as a fiduciary – engaged in fraud, the resulting debt could be non-dischargeable pursuant to § 523(a)(4).  In its post-trial memorandum, the Partnership briefly addresses the fraud aspect of § 523(a)(4), arguing the Debtor engaged in fraud by misrepresenting the Fox Run sale proceeds would be used to repay the House Money, and the Partnership detrimentally relied on this statement.[189]  This is not enough.  There is no evidence supporting the conclusion the Debtor possessed an intent to engage in a scheme to defraud the Partnership at the time of borrowing money from the Partnership.  There is no evidence the Partnership detrimentally relied upon or changed its conduct based upon this alleged misrepresentation.  At best, the Partnership's evidence suggesting the Debtor engaged in a fraud matches the evidence the Debtor did not engage in fraud.  As in baseball, a tie goes to the runner.  Here, the Partnership bears the burden to establish its case by a preponderance of the evidence and did not meet it as to the § 523(a)(4) fraud claim.

### *Larceny Under Section 523(a)(4)*

To constitute larceny pursuant to § 523(a)(4), the Partnership must prove by a preponderance of the evidence that: 1) the Debtor's withdrawal of Partnership funds was wrongful, and 2) he possessed an unlawful intent at the time of the withdrawals.  Again, the evidence supporting such a conclusion is lacking.  The Partnership Agreement granted authority to make loans to partners.[190]  Absent from the Partnership Agreement are any restrictions or required terms for loans made to partners.

---

[189]     AP-ECF No. 264, p. 25.
[190]     AP-ECF No. 214-3, §8.1(18).

Additionally, the Debtor testified his intent at the time of the withdrawals was to repay the funds.  *See*, AP-ECF No. 249, p. 75, L. 19-25, p. 58, L. 1-8, p. 111, L. 13-15; *See also*, AP-ECF No. 252, p. 120, L. 12-20 (Debtor credibly testified he believed the Stratford car wash's projected net income would enable him to repay the funds taken to finance its purchase within six years.).  While the Partnership claims this testimony is self-serving, the testimony of two other witnesses – the Partnership's Accountant and Helen – corroborate the Debtor's testimony about his intent at the time of the withdrawals, including:

- Partnership's Accountant testified the Debtor told him in 2004 the Partnership funds withdrawn for the Abbey Road purchase were a loan to be repaid;[191] and

- Helen testified she understood and was told the funds withdrawn to finance the Abbey Road property purchase were to be considered a bridge loan.[192]

The Partnership discounts this testimony because all the information comes from a single source – the Debtor.  *See*, ECF No. 267, p. 4 ("So, essentially, [the Partnership's Accountant's] testimony merely repeats the lie that [the Debtor] told him. Again – no corroborating evidence.").  However, the Partnership's argument ignores the fact it bears the burden of proof.  The Debtor does not need to prove his intention was lawful.  Rather, the Partnership must prove his intention was wrongful.  The Partnership failed to present alternative evidence discrediting the Debtor's stated intent.  Accordingly, the record falls short of showing the Debtor possessed a wrongful intent necessary for larceny pursuant to § 523(a)(4).

---

[191] AP-ECF No. 249, p. 164, L. 11-22.
[192] AP-ECF No. 250, p. 67, L. 13-17.

### *Evidence of Intent Required for Embezzlement is Lacking*

The Partnership must establish three elements for embezzlement, including: 1) that the Debtor rightfully possessed the Partnership's property; 2) the Debtor appropriated the Partnership's property for use other than the use for which the property was entrusted; and 3) the circumstances implied a fraudulent intent.  *In re Daffner*, 612 B.R. at 651.  The first element is satisfied because the Partnership Agreement granted authority to the Debtor as the managing partner to make loans to partners.  However, the second and third elements are not satisfied.  Again, the problem is the intent.  Even if arguably the Debtor possessed the Partnership funds rightfully, and later, decided not to repay them, the evidence does not support a finding that the Debtor's intent was fraudulent.  First, the Debtor's testimony was he believed he could use the funds to support his children and invest in businesses for their future.[193]   Second, the Debtor repeatedly testified he intended to repay the money.[194]   The Partnership provided no evidence to counter this stated intention.  Rather, the Partnership asks the court to discount the majority of the testimony from the Debtor, Helen, and the Partnership's Accountant, and believe that the Debtor masterminded an elaborate scheme to siphon money out of the Partnership over a series of years for his own personal gain.  This is unpersuasive.  The Partnership's arguments in its post-trial brief are conclusory and unsupported by the record at trial. *See*, AP-ECF No. 264, p. 26 ("Moreover, he committed embezzlement by appropriating these moneys for his own benefit, in a fraudulent and deceitful fashion").  Like with defalcation and larceny, the Partnership failed to present evidence showing it was more

---

[193]        *See*, AP-ECF No. 252, p. 7, L. 7-15, p. 74, L. 9-10, p. 89, L. 5-25, p. 90, L. 1-2, p. 108, L. 8-10.
[194]        *See*, AP-ECF No. 249, p. 75, L. 19-25, p. 58, L. 1-8, p. 111, L. 13-15; *see also*, AP-ECF No. 252, p. 120, L. 12-20.

likely than not that the Debtor possessed the fraudulent intent necessary for a finding of embezzlement.

### *The Partnership Fails to Prove Debtor Acted Willfully and Maliciously*

The Partnership contends the Debtor willfully and maliciously caused injury to it and the resulting debt should be non-dischargeable pursuant to § 523(a)(6).  This is at most a generous reading of the Partnership's post-trial briefing.  Arguably, the court could have found the Partnership waived its claim under § 523(a)(6) by failing to properly address it in its post-trial briefs.  In fact, the Partnership only references § 523(a)(6), or its elements – willful and malicious – in one sentence: "Dilworth's actions were willful and malicious in causing significant financial injury to the Partnership, providing additional grounds for non-dischargeability under 11 U.S.C. §523(a)(6)."  *See*, AP-ECF Nos. 264, p. 2; *see also*, AP-ECF No. 267 (§ 523(a)(6) claim not addressed).

First, the record is bereft of evidence supporting a conclusion the Debtor deliberately or intentionally caused injury to the Partnership.  At most, the evidence shows the Debtor repeatedly withdrew funds from the Partnership without documenting the basis, term, or purpose of the withdrawals, made bad investments, and was never able to dig himself out of the financial hole he created.  Was this an example of poor business and investment practices?  Certainly.  Was this negligence?  Most likely.  Was this conduct reckless?  Possibly.  But none of that amounts to willfulness for purposes of § 523(a)(6).  *See*, *In re Margulies*, 541 B.R. at 161–62 ("the plaintiff must demonstrate that the debtor deliberately intended to injure the plaintiff"); *In re Mitchell*, 227 B.R. at 51 (Willfulness "includes conduct that the actor is substantially certain will cause injury.").

The Partnership bore the burden to show the Debtor acted willfully but failed to carry that burden.

Even if the Partnership could satisfy the willful element of § 523(a)(6), the malicious element is lacking.  Malicious for purposes of § 523(a)(6) includes conduct: "wrongful and without just cause or excuse" or "from which one could only conclude that the debtor's motivation must have been to inflict harm upon the creditor."  *See*, *Ball*, 451 F.3d at 69; *Luppino*, 221 B.R. at 700.  None of the witnesses at trial testified the Debtor's intent was to inflict harm or purposely cause the Partnership to lose money.  Rather, as repeatedly stated, the evidence suggests the Debtor intended to borrow money from the Partnership to benefit his family and intended to repay the funds.  There is insufficient evidence contradicting this testimony.  Accordingly, the Partnership's § 523(a)(6) claim fails.

## VII.   CONCLUSION

After careful consideration of the evidence, the record of the bankruptcy case, this instant adversary proceeding, and the parties' arguments, the Partnership did not meet its burden of proof and did not establish by a preponderance of the evidence that the Debtor had the wrongful intent pursuant to §§ 523(a)(4) or (a)(6) to conclude the debt to the Partnership should be non-dischargeable.  What appears to be terrible decision making by the Debtor – including poor judgment, a failure to confront the true costs to maintain his large family, and a lack of forthright transparency with himself and other partners – is not enough to render a debt to the Partnership non-dischargeable.  I have considered all other arguments by the Partnership and find them unpersuasive or unsupported by the record.  Because I conclude the Partnership failed to prove its *prima facie* case, I need not reach any of the Debtor's special defenses.  Therefore, a separate

judgment in this adversary proceeding in favor of the defendant, Michael P. Dilworth, the debtor in the underlying Chapter 7 case, shall enter.

This decision does not address the United States Trustee's motion to dismiss the Chapter 7 case. A separate scheduling order regarding that motion will enter in the Chapter 7 case.

**This is a final order subject to rights of appeal. The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket.** *See,* **Fed.R.Bankr.P. 8002(a)(1).**

Dated this 31st day of March, 2022, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut